STATE OF VERMONT
ENVIRONMENTAL COURT

|  |  |  |
|---|---|---|
| SECRETARY, VERMONT AGENCY | } | |
| OF NATURAL RESOURCES, | } | |
| Plaintiff | } | |
| | } | |
| v. | } | Docket No. 101-6-09 Vtec |
| | } | (Washington site) |
| KEN BACON AND KEN BACON, JR., | } | |
| d/b/a BACON TIMBER HARVESTING, | } | |
| Respondents | } | |
| | } | |

## DECISION ON THE MERITS

This environmental enforcement proceeding was heard before the Vermont Environmental Court on January 26, 2010, Thomas S. Durkin, Environmental Judge presiding. Upon the close of evidence from all parties,[1] the Court conducted preliminary deliberations and thereafter made the initial factual and legal determination that the violations alleged by ANR had been committed.

The Court thereafter instructed counsel for the Vermont Agency of Natural Resources ("ANR") to submit a post-trial memorandum concerning its requests for relief and allowed Respondents an opportunity to respond to ANR's post-trial filings. After those filings were received by the Court, the Court completed its deliberations, research, and drafting of this Decision. This Decision is intended to address all claims and defenses offered by the parties in the merits hearing.

### Introduction and Procedural Background

The Secretary of the Agency of Natural Resources ("Secretary") issued an Administrative Order ("Order") to each Respondent on June 2, 2009. The Order alleged violations of 10 V.S.A. § 1259(a). Respondents requested a hearing on the Order, which was the subject of the January 26, 2010 merits hearing, noted above. The following is an outline of the facts the Court found most credible and persuasive in concluding that the alleged violations had occurred. Following

---

[1] At the close of evidence, Respondents requested permission to submit written testimony from their trucking contractor to substantiate their claim that their site preparation work had been properly performed. The Court granted this request. However, Respondents failed to file written testimony from any third-party witness.

this outline of factual findings, we explain and render our legal conclusions on the Secretary's penalty and compliance/injunctive relief requests.

*Relevant Facts*

Respondents are engaged in the business of logging under the business name "Bacon Timber Harvesting." Respondent Ken Bacon has been in the logging business for approximately thirty years. Respondent Ken Bacon, Jr. has been in the logging business for approximately eight to nine years. Respondent Ken Bacon now works with and for his son, Respondent Ken Bacon, Jr., as Bacon Timber Harvesting.

The Secretary has established rules and standards entitled "Acceptable Management Practices for Maintaining Water Quality on Logging Jobs in Vermont" ("AMPs"). The Secretary, pursuant to his statutory powers, has directed that all loggers employ AMPs before, during, and after logging operations, so as to ensure the prevention of unpermitted discharges into State waters. These AMPs require safe logging management practices, including the installation of appropriate stream crossings, appropriate locations for log landings, installation of waterbars on skid roads, and a prohibition against discharging logging slash and debris in State waters.

In April 2008, Respondents contacted Robert Corvi, who owns property on Hill Farm Road in Washington, Vermont ("the property"), about conducting logging activities on Mr. Corvi's property. Hill Farm Road is a Class IV town road. Following this contact, Respondents engaged in logging activities on the property for at least one month prior to August 2008, as evidenced by correspondence and scale slips sent to Mr. Corvi.

On August 8, 2008, Vermont Forest, Parks, and Recreation ("FP&R") Forester, Brad Greenough, received a complaint of AMP and discharge violations from the logging operation on the Corvi property. On August 12, 2008, Mr. Greenough, Fish and Wildlife Game Warden, Keith Gallant, and another FP&R Forester, Dave Wilcox, inspected the property. During this inspection, they observed that the operation's log landing was located immediately adjacent to an unnamed stream and therefore in violation of the AMP rule that specifies a minimum fifty-foot buffer between a log landing and a stream. The unnamed stream is a State water. They also observed logging debris in the stream below the landing, which constitutes a violation of the AMP that prohibits logging slash and debris from being deposited in a stream. Harvested logs had also been placed in a ditch along Hill Farm Road, thereby restricting water flow and causing

2

water to leave the ditch, partially wash out the town road, and discharge sediment into the unnamed stream.

Upon further inspection, these State officials discovered that a single culvert, approximately ten feet long and twelve inches in diameter, had been placed at a stream crossing to access the property and had become blocked with sediment and debris. This caused the unnamed stream to be diverted from its natural course and run through the log-landing area and down an embankment. The diverted stream water then ran back into the natural watercourse, resulting in a discharge of sediment into the unnamed stream. This culvert was inadequate for this location, as it was undersized in both length and diameter, and therefore in violation of the AMP that requires appropriate stream-crossing structures. A twenty-foot long, twenty-four-inch diameter culvert was appropriate for this location. Further inspection of the property revealed that no waterbars had been installed on any of the skid roads, particularly the skid roads immediately uphill of the stream crossing. Waterbars along skid roads, particularly in the vicinity of streams, are required AMP measures. The lack of waterbars caused erosion and soil migration downhill, causing further discharges of sediment into the unnamed stream. Respondents did not have any permits for the observed stream discharges.

Following the inspection, Mr. Greenough contacted Mr. Corvi and arranged for remediation of the site. Mr. Greenough inspected the property on August 18 and 20, 2008, and determined that Mr. Corvi had completed the necessary remediation work, at his expense.

By failing to follow AMPs, which resulted in discharges of material into State waters without a permit, Respondents violated 10 V.S.A. § 1259(a).

### *Penalty*

In accordance with 10 V.S.A. § 8010(b), the Secretary is required to consider the following factors in determining the amount of the penalty; pursuant to 10 V.S.A. § 8012(b)(4) the Court must then review and determine anew the amount of penalty for the violations using these same criteria:

1. actual or potential harm to human health and the environment;
2. presence of mitigating circumstances including unreasonable delay on the part of the Secretary in seeking enforcement;
3. whether the respondent knew or had reason to know the violation existed;
4. record of compliance;

5. economic benefit gained from the violation;[2]

6. deterrent effect of the penalty;

7. actual cost of enforcement; and

8. length of time the violation has existed.

Based upon the evidence presented at trial, and after the Court has afforded such evidence the weight and credibility it deems appropriate, we render the following legal determinations on each of these criteria.

### *Harm to the environment (10 V.S.A. § 8010(b)(1))*

Respondents' activities caused actual harm to the unnamed stream. The failure to install any waterbars on skid roads caused sediment to run down the roads and discharge into the stream. The discharge of logging slash and debris into the stream served to impede water flow and compound sediment buildup in the stream. The cumulative effect of the discharges caused a blockage of the undersized culvert, resulting in the stream being diverted from its natural course. Extensive sedimentation of the stream occurred as a result of failing to comply with and implement the applicable AMPs. Given the amount of sedimentation, along with the fact that Respondents' activities caused a diversion of State waters, we conclude that the significant penalty requested by the Secretary should be imposed.

### *Mitigating circumstances (10 V.S.A. § 8010(b)(2))*

We find no mitigating circumstances in Respondents' favor in this case. The Secretary sought enforcement for the violations at issue within a reasonable time frame. Respondents asserted that a severe rainstorm that occurred while they were working on the Corvi property was the cause of the stream discharges, and not their logging activities, even though Respondents conceded that they failed to conform to the AMPs. However, we find more persuasive the Secretary's argument that by placing an undersized culvert at the log landing, by not constructing waterbars on their skid roads, and by allowing logging slash and other debris to be strewn into the streams, Respondents were responsible for the unpermitted stream discharges and damages that resulted. Respondents have presented no reasonable or relevant evidence to mitigate any

---

[2] Effective July 1, 2008, the recapture of economic benefit was separated from the penalty factors in 10 V.S.A. § 8010(b) and is now found in 10 V.S.A. § 8010(c)(2). The Secretary submits the discharge violations occurred and were observed following the statutory change and therefore, the amended statute applies to the recapture of economic benefit. The Secretary submits that in this case there is no practical difference in the amount requested under this criterion.

penalty imposed by the Court, thereby leaving this Court with no choice but to conclude that no mitigating circumstances exist in this case.

### *Did Respondents know or have reason to know the violation existed (10 V.S.A. § 8010(b)(3))*

Respondents knew and had reason to know that they caused the violations that existed on the Corvi property. Respondent Ken Bacon has been in the logging business for thirty years. The State first adopted the AMPs in 1987; Ken Bacon knew of their existence and had prior knowledge of their applicability to logging practices. In 2001, he entered into a Consent Order with the Vermont Attorney General's Office due to his admission of violating these same AMPs, 10 V.S.A. § 1259(a), and Vermont Solid Waste Management Rule 6-302(d). He therefore had reason to know of the prohibition against unpermitted discharges to State waters and the applicability of AMPs to logging jobs.

Respondent Ken Bacon, Jr. has been in the logging business for approximately eight to nine years, and he acknowledged during the merits hearing of being aware of the AMPs and their applicability to logging jobs.

Respondents were also previously put on notice regarding compliance with AMPs and the prohibition against unpermitted stream discharges during their interaction with FP&R personnel on a logging site located in Hyde Park. The activities at that site are also the subject of an Agency enforcement action in Docket No. 102-6-09 Vtec. Those interactions began in July 2006 and continued through June 2007, and they consisted of on-site meetings, telephone conversations, and written correspondence both Respondents had with State officials. Despite all of these factors, Respondents failed to adhere to any of the applicable AMPs at the Washington site.

### *Record of compliance (10 V.S.A. § 8010(b)(4))*

As discussed above, Respondent Ken Bacon entered into a Consent Order with the Vermont Attorney General's Office in 2001 for violations of AMPs, 10 V.S.A. § 1259(a), and Vermont Solid Waste Management Rule 6-302(d). The Orleans Superior Court signed the Consent Order on June 11, 2001, in Docket No. 193-7-00 Oscv. Thus, the evidence revealed that the elder Mr. Bacon has already been subjected to compliance proceedings, enforcement litigation, and fines for violations similar to those he and his son committed on the Corvi property. Even after this experience, Respondents seem unwilling to take the necessary steps to

5

adhere to AMP logging rules and standards that the Secretary has administered for the last twenty-three years.

### *Economic benefit gained from the violation (10 V.S.A. § 8010(c)(2))*

Respondents realized an economic benefit by avoiding compliance with appropriate AMP stream-crossing rules and standards prior to and during logging operations on the Corvi property and by failing to install waterbars on skid roads. These benefits are derived from the avoided time and costs of performing these activities.

Respondents crossed the stream adjacent to the log landing on the Corvi property without an appropriate AMP structure in place. A twenty-foot long, twenty-four-inch diameter culvert was minimally required at this location. Such a structure would have taken approximately two hours to construct, at a cost of approximately $100 per hour, given the need for excavation equipment. An appropriately sized culvert costs approximately $300. The total avoided costs associated with this stream crossing are approximately $500.

Respondent also avoided incurring the costs associated with installing necessary waterbars on the skid roads. Logging AMPs required four waterbars to be constructed and maintained in the course of the Corvi logging operation. These waterbars would have taken approximately two hours to construct at a cost of approximately $100 per hour; the total avoided costs are approximately $200.

Respondents utilized an inappropriate stream-crossing structure during the Corvi logging operation and failed to install any waterbars during the course of operation. Respondents should not be afforded the benefit of being able to avoid both the time and costs associated with these activities. By not installing and implementing these AMPs, Respondents recognized an economic benefit through both a competitive advantage in time saved and a financial saving through avoided costs. Respondents unlawfully received total economic benefits in this case of at least $700.

### *Deterrent effect of the penalty (10 V.S.A. § 8010(b)(6))*

Given Respondents' knowledge of the AMPs and applicable law, we conclude that a penalty is necessary to deter similar unlawful actions in the future by Respondents and others in the regulated community. Respondent Ken Bacon has previously violated 10 V.S.A. § 1259(a) as it relates to AMPs. Respondents were also put on notice regarding compliance with AMPs and the prohibition against unpermitted discharges during their interaction with FP&R personnel

6

on a logging site located in Hyde Park. The activities at that site are also the subject of an Agency enforcement action in Docket No. 102-6-09 Vtec. Those interactions began in July 2006 and continued through June 2007, and they consisted of on-site meetings, telephone conversations, and written correspondence. Despite all of these factors, Respondents failed to comply with any of the AMPs at the Washington site, resulting in discharges into State waters. Imposition of a penalty is therefore appropriate in this case to deter similar violations in the future by Respondents and others in the regulated community.

### *Cost of enforcement (10 V.S.A. § 8010(b)(7))*

ANR officials incurred enforcement costs as a consequence of Respondents' violations. Mr. Greenough spent approximately thirty-seven hours in connection with site visits, administrative activities, preparing the case for enforcement, preparing for the merits hearing, and testifying at the merits hearing. His hourly salary including benefits is $34 per hour. His costs therefore total approximately $1,258. Environmental Enforcement Officer Sean McVeigh spent approximately one hour in connection with exhibit preparation. His hourly salary including benefits is $40. His costs therefore total approximately $40. Gary Sabourin, Watershed Forester for FP&R, spent approximately seventeen hours preparing for and testifying in the merits hearing. His hourly salary including benefits is $42. His costs therefore total approximately $714. Based on their testimony, the costs ANR incurred as a consequence of Respondents' violations total at least $2,012.

### *Length of time the violation has existed (10 V.S.A. § 8010(b)(8))*

Respondents engaged in logging activities on the property for at least one month prior to the observed discharges, as evidenced by correspondences and the July 2008 scale slips sent to Mr. Corvi by Mrs. Bacon (wife of Ken Bacon and bookkeeper for Bacon Timber Harvesting). During that time, Respondents never implemented appropriate AMPs. The discharges in this case were observed to have continued through August 12, 2008. Thereafter, the landowner (Mr. Corvi) was required to complete the remediation work for which Respondents were responsible. While this is a fairly short to moderate length of time, the failure to implement the AMPs caused significant sedimentation of the unnamed stream, and it required the landowner, at his own cost, to remediate Respondents' violations.

For all of the foregoing reasons, the Court imposes a penalty of $7,000 for the violations, plus $700 for Respondents' realized economic benefit, plus $2,012 for ANR's costs of enforcement, for a total penalty of $9,712.

*Injunctive Provisions*

The Court has the authority to affirm an administrative order issued by the Secretary, or vacate and remand an order when the procedure contained in the order is not reasonably likely to achieve the intended result. 10 V.S.A. § 8012(b)(2). The Administrative Order in this matter requires Respondents to participate in logger education training, comply with applicable laws, notify FP&R of upcoming logging jobs, and permit inspections of jobs, all during the following three-year period. The Order also includes additional penalties for non-compliance with these provisions. The directives contained in the Order specify that:

B. No later than December 15, 2009, Respondents shall contact FP&R to enroll in the "Logger Education to Advance Professionalism" ("LEAP") Program.

C. Respondents shall participate in LEAP training when it is next offered in the Spring of 2010. Respondents shall attend no less than three days of training, which shall include the following topics to the extent possible: Managing and Using Forest Ecosystems; Professionalism in Forestry; and Forest Water Quality, Erosion Control and Wetlands. Respondents shall provide proof of satisfactory completion of the above training to FP&R within 30 days of the conclusion of the LEAP training. In the event Respondents fail to participate in, and satisfactorily complete, the LEAP training in accordance with this paragraph, Respondents shall pay a penalty of $2,000. This amount shall be in addition to the penalty amount specified in paragraph A [of the Administrative Order]. Payment shall be received no later than August 1, 2010. Payment shall be by check made payable to the "Treasurer, State of Vermont" and forwarded to the address listed in paragraph A [of the Administrative Order].

D. Respondents shall implement and comply with all logging AMPs and apply for and obtain all necessary logging-related State environmental permits on all future logging operations.

E. Respondents shall notify FP&R in writing no less than five (5) days prior to commencement of any logging operation in Vermont. Specifically, Respondents shall send written notice to the District AMP Forester in the District where the logging operation is to take place. The notice shall include the planned starting date of logging, the size of the parcel to be logged, and directions to the job site. Respondents shall provide this notice for a period of three (3) years from the effective date of this Order. In the event Respondents fail to notify FP&R of any upcoming logging operation in accordance with this paragraph, Respondents shall pay a penalty of $500 for each instance of non-compliance. This amount shall be in addition to the penalty amounts specified in paragraphs A [of the Administrative Order] and C above. Payment shall be received no later than fifteen (15) consecutive calendar days following written notice by

the Agency. Payment shall be by check made payable to the "Treasurer, State of Vermont" and forwarded to the address listed in paragraph A [of the Administrative Order].[*]

F. Respondents shall permit employees and representatives of FP&R and the Agency to inspect Respondents' logging activities upon receipt of 24-hour notice, for the three (3) year period.

These directives serve two purposes. First, by participating in training, Respondents will receive education on the AMPs, applicable laws relating to water quality, and ways to protect water quality that comply with the AMPs. Second, by notifying FP&R of upcoming logging jobs, Respondents will have the opportunity to work with FP&R before starting a job to identify AMPs that would be appropriate for the particular site. This is a proactive approach that can serve to minimize the need to respond to any complaints, reduce the likelihood of discharge violations, and ultimately help to better protect State waters during logging activities. The Administrative Order's directives set forth steps that are reasonably likely to achieve these intended results.

## *Conclusion*

Based on the evidence presented at the merits hearing, the Court concludes that Respondents violated 10 V.S.A. § 1259(a) by failing to follow AMPs, and that this failure resulted in material discharges sediment and logging debris into waters of the State without a permit. As a consequence of such violations, the Court imposes a total penalty in the amount of **$9,712**, in addition to any penalty amount imposed in Docket No. 102-6-09 Vtec. Due to the additional time expended in these proceedings, the Court modifies the following deadlines in the Administrative Order, so as to allow sufficient time for Respondents to comply:

➢ The deadline in paragraph B is hereby changed from "December 15, 2009" to "December 15, 2010."

➢ The two deadlines in paragraph C are hereby changed from "Spring of 2010" to "Spring of 2011," and "August 1, 2010" to "August 1, 2011."

➢ The Respondents are hereby ordered to comply with paragraphs B through F as modified above.

This completes the current proceedings before the Court in this Docket. A Judgment Order accompanies this Decision.

---

[*] The penalty amounts specified in paragraphs C and E of this Administrative Order shall be concurrent with, rather than in addition to, paragraphs C and E of the Administrative Order for the Hyde Park site.

Done at Berlin, Vermont this 19th day of April, 2010.

_____
Thomas S. Durkin, Environmental Judge